NOT DESIGNATED FOR PUBLICATION

No. 122,684

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NANG THACH,
*Appellee*,

v.

FARMLAND FOODS, INC.
and
SAFETY NATIONAL CASUALTY CORP.,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed December 17, 2021. Affirmed.

*Kendra M. Oakes*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellants.

*Roger A. Riedmiller*, of Riedmiller, Andersen & Scott LLC, of Wichita, for appellee.

Before WARNER, P.J., BUSER and CLINE, JJ.

BUSER, J.: This is an appeal by Farmland Foods, Inc., (Farmland) of a workers compensation award to its employee, Nang Thach, who was seriously injured while riding his motorcycle in the parking lot of the Farmland plant. The administrative law judge (ALJ) and Kansas Workers Compensation Board (Board) found that Thach's motorcycle accident arose out of and in the course of his employment as a mechanic. Farmland appeals, contending the Board erroneously interpreted and applied the law. Farmland also asserts the Board's decision was not supported by substantial competent evidence.

1

Upon our review, we hold the Board did not err in its interpretation or application of the workers compensation law when it concluded that Thach's accident arose out of and in the course of his employment as a Farmland mechanic. Moreover, we also hold the Board's award of compensation was supported by substantial competent evidence. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Preliminarily, during the pendency of this case, Farmland merged with other corporate entities, resulting in changes to the name of the corporation. For simplicity, however, Thach's employer will be referred to as Farmland throughout this opinion.

On January 28, 2015, Thach arrived for work at the Farmland plant at about 10:35 p.m. Thach worked as a mechanic on the third shift, which operated from 10:35 p.m. to about 8 a.m. When Thach arrived, he parked his motorcycle in a space designated as a handicapped parking space in the supervisors' area of the parking lot.

The parking lot had two designated areas; one area had parking spaces for supervisors, managers, office staff, inspection agency employees, and individuals with disabilities, while the other area was for employees generally. This latter employee parking area included parking spaces specifically designated for motorcycles. One employee estimated there were about six motorcycle parking spaces in the lot. Other employees stated that non-motorcycle vehicles sometimes parked in the motorcycle parking area to be closer to the plant's entrance.

At Farmland, employees were assessed half a point against their record if they arrived late to work. If an employee accumulated a certain number of points they were terminated.

2

Before going on break, Thach told Tin Truong, his brother-in-law who also worked as a third shift mechanic, that he was going to move his motorcycle during the break because it was parked in a handicapped parking space in the supervisors' parking lot, as all the parking spaces for motorcycles in the employee parking area were taken when he arrived for work.

Manuel Diaz-Fina, the Director of Human Resources, testified that employees had a guaranteed 15-minute pre-lunch break before their 30-minute lunch break. Employees remained on the time clock during the pre-lunch break, which was paid employee time. Farmland's policy provided that employees could leave the building during their pre-lunch and lunch breaks but they must return to work on time. Employees were permitted to be in the parking lot during their pre-lunch break and move their vehicles in the parking lot if necessary.

Thach went on break at about midnight on January 29, 2015. Earlier in the evening, he spoke to Ryaan Mitchell, another third shift employee, about his motorcycle. Thach showed Mitchell photographs of the motorcycle and asked him if he wanted to see it. Mitchell agreed, and the two men went outside to the parking lot during the break.

Mitchell watched Thach start his motorcycle and ride straight ahead before turning left down an aisle. Mitchell walked behind Thach as he was riding the motorcycle. Mitchell testified that Thach drove past the motorcycle parking spaces, although he could not recall whether the spaces in that designated area were full at the time. Mitchell recalled that the motorcycle was operating fine at first before beginning to sway back and forth. Shortly thereafter, Thach lost control of the motorcycle and fell to the ground. According to Mitchell, he was about 10 feet behind Thach when the accident occurred. He estimated that Thach was traveling about 10 miles per hour. At the time of the accident, Thach was not wearing a motorcycle helmet but was wearing a safety helmet he used when working at Farmland.

3

Mitchell ran to Thach and tried to talk to him, but he was unresponsive. Other employees, including a plant manager, arrived shortly thereafter. The plant manager directed Mitchell to notify security and tell them to call an ambulance. The ambulance transported Thach to the hospital. Doctors performed a craniectomy to alleviate bleeding and severe swelling of the brain.

Stanley Yost, another third shift mechanic, and Truong went to the parking lot after hearing about the accident. Yost and Truong moved Thach's motorcycle to an available space in the motorcycle parking area.

Thach sustained numerous injuries in the accident which resulted in cognitive deficits, memory problems, and impaired speech. As a result, his sister, Diep Thach, became his appointed guardian after the accident. Dr. Trevor Patton, Ph.D., a neuropsychologist who performed an independent neuropsychological evaluation of Thach, concluded that he exhibited behavioral irregularities, including high levels of distractibility and anxiety. Dr. Patton also determined that Thach exhibited serious neurological issues that were consistent with having sustained a traumatic brain injury.

Aaron Stegman, a safety manager at Farmland, inspected the parking lot area where the accident occurred. He found nothing unusual and no defects. Security camera video showed Thach riding past the motorcycle parking area, but the video did not show whether there were any available parking spaces. The video did not show how fast Thach was traveling or how the accident occurred.

When asked about the capacity of the parking lot, Stegman testified that he assumed spaces were available for Thach to park because he worked during the third shift. However, Yost recalled the parking lot was almost full on the night of the accident and he remembered seeing non-motorcycle vehicles parked in the motorcycle area. Stegman testified that after the accident, Farmland placed heavier barriers in front of the

motorcycle parking area to prevent non-motorcycle vehicles from parking there and to accommodate motorcycle parking.

Diaz-Fina testified about Farmland's written parking policy, which stated:

"Farmland assumes no responsibility for damage to vehicles, assault or injury to persons, or theft/damage to the contents of a vehicle entering, parking on, or exiting Company property. Employees are expected to follow all parking restrictions and speed limits while on Company property. Employees without the appropriate authorization or permit may not park in restricted or reserved slots. Any vehicle parked in violation of Company rules is subject to towing at the owner's expense."

Diaz-Fina agreed that parking in a handicapped parking space without the proper permit was contrary to Farmland's parking policy. He also agreed that if an employee was violating company policy, the employee should stop and take corrective action to remedy the violation. This included moving a vehicle parked in violation of Farmland's parking policy. Diaz-Fina testified that, although authorized by Farmland's policy, the company was unlikely to tow any vehicle from the parking lot. In fact, he was unaware of any vehicle ever being towed from the parking lot.

John Schellhorn, the third shift maintenance supervisor, said that Thach was one of the employees under his supervision when the accident occurred. He agreed with Diaz-Fina that employees were expected to park only in designated areas of the parking lot. If they did not, Schellhorn believed the employee should rectify the problem. He also agreed with Diaz-Fina that employees were permitted to go to the parking lot during their break. In short, Thach did not violate Farmland's policy when he went to the parking lot to move his motorcycle.

To make sure employees parked in the appropriate designated areas of the parking lot, Brett Seeney, a security officer at Farmland, performed parking lot checks. Seeney

said that supervisors had stickers on their vehicles, while other employees did not. Whenever he encountered a vehicle that was parked in the supervisors' area that did not have a sticker, he would issue a ticket. Seeney testified that he had never contacted a tow company nor seen a vehicle towed from the lot.

Yost testified that he had previously received a ticket for parking in the supervisors' parking area. He also recalled seeing other employees go outside to the parking lot during their breaks to smoke or to move their vehicles. According to Yost, this was a regular occurrence because employees would often move their vehicles to a more desirable location once employees from others shifts left the parking lot. He did not recall any Farmland policy against moving a vehicle while on break. Loren Howard, a maintenance lead, and Truong testified about employees receiving parking tickets for improper parking in the Farmland lot.

On June 28, 2019, the ALJ ruled that Thach was permanently and totally disabled from his injuries. The ALJ also found that Thach's

> "short break and his activities during it, including moving his motorcycle to a different parking spot, fall within the personal comfort doctrine and were incidents of his employment. As such, the Court finds that Claimant has met his burden to prove that his accidental injury arose out of and in the course of his employment with [Farmland]."

Thach was awarded temporary and permanent total disability compensation and medical expenses.

Farmland filed an application for review with the Board. It sought review on several issues. It contested that Thach's accident arose out of his employment, and contended that there was not a causal connection between the conditions of his work duties and the resulting accident, that Thach's accident arose out of a neutral risk with no

particular employment or personal character, that the accident arose out of a personal risk, and that idiopathic causes contributed to Thach's motorcycle accident.

On review, the Board found:  "The ALJ's conclusions of law and analysis of the nature and extent of [Thach's] impairment, why [Thach's] accidental injuries arose out of his employment with [Farmland] and [Thach's] entitlement to future medical benefits are well-reasoned and detailed and adopted in their entirety by the Board." The Board concluded that Thach was permanently and totally disabled and entitled to future medical treatment. Moreover, it concluded the motorcycle accident arose out of his employment and was more likely than not the result of his attempt to comply with Farmland's parking policy. The Board also determined that Thach's accident fell within the personal comfort doctrine. Accordingly, the Board affirmed the ALJ's award of worker's compensation benefits.

Farmland timely appeals.

DID THACH'S INJURIES ARISE OUT OF AND IN THE COURSE OF HIS EMPLOYMENT?

For its first issue on appeal, Farmland contends the Board erroneously interpreted or applied the law when it found that Thach's injuries arose out of and in the course of his Farmland employment. In particular, Farmland claims the personal comfort doctrine is inapplicable; there was not a causal connection between the conditions under which Thach's work was required to be performed and the resulting accident; the injuries were due to a neutral risk with no particular employment or personal character; and his injuries arose out of a risk that was personal to the worker.

Thach counters these assertions. He argues the Board did not erroneously interpret or apply the law when it found the personal comfort doctrine was applicable under

7

circumstances wherein Thach was injured on Farmland's premises while on an authorized paid break and moving his motorcycle from a designated handicapped parking space.

*Standards of Review and Brief Summary of Relevant Law*

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governs our court's review of cases arising under the Kansas Workers Compensation Act (KWCA), K.S.A. 2020 Supp. 44-501 et seq. K.S.A. 2020 Supp. 44-556(a). Under the KJRA, relief may be granted only for statutorily enumerated reasons. One such reason is raised in this first issue: the agency erroneously interpreted or applied the law. K.S.A. 77-621(c)(4).

This appeal turns on the meaning of certain statutes within the KWCA. Interpretation of a statute is a question of law subject to de novo review. *Johnson v. U.S. Food Service*, 312 Kan. 597, 600, 478 P.3d 776 (2021). The KWCA is to be liberally construed to bring employers and employees within the provisions of the act, and the KWCA's provisions should be applied impartially to both employers and employees in cases arising under it. K.S.A. 2020 Supp. 44-501b(a); see *Fernandez v. McDonald's*, 296 Kan. 472, 479-80, 292 P.3d 311 (2013). "When exercising unlimited review on questions of statutory interpretation, an appellate court owes no deference to interpretations given to the [KWCA] by [the Board]." *Estate of Graber v. Dillon Companies*, 309 Kan. 509, Syl. ¶ 2, 439 P.3d 291 (2019).

Under the KWCA, an injury is compensable only if it arises out of and in the course of employment. K.S.A. 2020 Supp. 44-508(f)(2). Accidental injuries arise out of employment only if (1) "[t]here is a causal connection between the conditions under which the work is required to be performed and the resulting accident;" and (2) "the accident is the prevailing factor causing the injury, medical condition and resulting disability or impairment." K.S.A. 2020 Supp. 44-508(f)(2)(B)(i), (ii). An "accident or injury that arose out of a neutral risk with no particular employment or personal

8

character" is specifically excluded from being deemed as arising out of employment. K.S.A. 2020 Supp. 44-508(f)(3)(A)(ii). Injuries that occur while an employee is at work in the employer's service are deemed to have occurred in the course of employment. See *Rinke v. Bank of America*, 282 Kan. 746, 752, 148 P.3d 553 (2006). Finally, "[t]he interpretation or construction of the [KWCA] is a question of law. But once that interpretation or construction occurs, the ultimate question of whether an accident arises out of and in the course of employment is a question of fact. [Citation omitted.]" *Estate of Graber*, 309 Kan. at 513.

*The Personal Comfort Doctrine*

Because the Board adopted the ALJ's conclusion of law that Thach's injuries arose out of his employment, we begin our analysis with a review of the ALJ's findings regarding this issue. After surveying Kansas caselaw and the Board's decisions in similar cases, the ALJ observed that "the Board has consistently applied the personal comfort doctrine to injuries that occur when an employee is conducting personal activities while on a break from work." The ALJ concluded:

> "The Court finds that [Thach's] short break and his activities during it, including moving his motorcycle to a different parking spot, fall within the personal comfort doctrine and were incidents of his employment. As such, the Court finds that [Thach] has met his burden to prove that his accidental injury arose out of and in the course of his employment with [Farmland]."

The Board has previously defined the personal comfort doctrine:

> "Employees who, within the time and space limits of their employment, engage in acts which minister to personal comfort do not thereby leave the course of employment, unless the extent of the departure is so great that an intent to abandon the job temporarily may be inferred, or unless, in some jurisdictions, the method chosen is so unusual and unreasonable that the conduct cannot be considered an incident of the

9

employment." *Williams v. Allied Staffing*, No. 1,058,426, 2012 WL 1142973, at *3 (Kan. Work. Comp. App. Bd. March 28, 2012) (quoting 1 Larson's Workers' Compensation Law § 21 [2006]).

In the case on appeal, the Board affirmed the ALJ's legal conclusion that Thach's injuries arose from his employment by application of the personal comfort doctrine:

> "[Farmland] also argues that [Thach's] act of moving his motorcycle while on his break does not fall within the personal comfort doctrine because it does not benefit the employer. It is acknowledged that [Thach] was not parked in an appropriate spot. However, [Thach] attempted to correct his mistake the first opportunity he had to do so, which occurred on break. It is to the employer's benefit that all employees follow the rules and policies. By moving his motorcycle to an appropriate parking spot, [Thach] would have been in compliance with policies as well as alleviating his concern about receiving a ticket. Such circumstances meet the criteria of the personal comfort doctrine."

On appeal, both parties cite to *Gould v. Wright Tree Serv., Inc.*, No. 114,482, 2016 WL 2811983 (Kan. App. 2016) (unpublished opinion), but draw different conclusions from their understanding of the opinion. In *Gould*, the claimant worked as a groundsman for Wright Tree Service (Wright). As a groundsman, Gould picked up branches cut from trees and other tasks the foreman required, including refueling chainsaws.

In September 2013, Gould's foreman asked him to fill a chainsaw with gasoline. As Gould did so, gas leaked out of the chainsaw and onto his shirt. Shortly thereafter, the foreman told Gould he could take a short break. While on break, Gould lit a cigarette which caused his shirt to catch fire and he was injured. The ALJ originally entered an award in Wright's favor, but the Board reversed the ALJ's decision and found that Gould's injuries arose out of and in the course of his employment.

On appeal, Wright contended the Board failed to establish a causal connection between Gould's work and his resulting accident. Wright also argued that Gould's injury arose out of a personal or neutral risk instead of a work-related risk. Our court disagreed with Wright, stating that the Board properly found a causal connection because Gould's work required him to work with gasoline, which carried risks along with it, such as getting burned. 2016 WL 2811983, at *5.

When discussing Wright's argument that Gould's injury did not arise from his employment, our court stated:

"Wright argues Gould's injury did not arise out of his employment because at the time of his injury Gould had completed his job requirement to fill the chainsaw. This argument appears to conflate the standard for 'arise out of employment' and 'in the course of employment.' The standard for 'arising out of' only requires a causal connection between the conditions of the work and the injury—it does not require that the injury occur at the exact moment an employee is performing a certain job task. . . . At the time of his injury, Gould was no longer refueling chainsaws. He was, however, on the clock and continuing to perform the requirements of his job. Thus, the injury occurred within the course of his employment . . . ." 2016 WL 2811983, at *5.

Next, our court went on to discuss the personal comfort doctrine as it applied to *Gould*. After citing the definition, we stated that the "rule generally recognizes that tending to personal comfort is an incident of employment, and activities which are incidents of employment also 'arise out of' employment." 2016 WL 2811983, at *6 (quoting *Williams*, 2012 WL 1142973 at *3). Our court then held that injuries which occur on smoke breaks fall within the personal comfort doctrine and are compensable. *Gould*, 2016 WL 2811983, at *6.

Wright also argued that the employer did not require Gould to smoke cigarettes, which meant his injury should not be compensable. Again, we disagreed, reasoning that

11

Wright's argument would disallow personal comforts: "Employers may require employees to take breaks, but they do not require employees to eat, drink, or use the restroom as a condition of employment. Employers *allow* employees to do so, and it benefits both parties." (Emphasis added.) 2016 WL 2811983, at *7. Our court reasoned that smoking during the break fell within the ambit of the personal comfort doctrine. 2016 WL 2811983, at *7.

In sum, our court found the Board did not err in finding that Gould's injury arose out of and in the course of his employment. Since his employment required him to work with gasoline, gasoline spilling and catching on fire was a risk directly associated with his work. Moreover, because the accident occurred on a short, authorized break, and Gould was attending to a personal comfort during the break, smoking was an incident of his employment. As a result, Gould was working at the time of his injury, and his actions were causally connected to his job, which meant his injuries were compensable. 2016 WL 2811983, at *7.

Thach argues that *Gould* and other cases hold that if it is proven an employee is injured during a break "and what they were doing on their break could not be contended to be an abandonment of their job, and an accident occurs during said break, the injuries that arise from that accident arose out of employment by the mere fact that they occurred on break."

Farmland counters that *Gould* supports the proposition that the "personal comfort doctrine may be applied to establish an employee was in the course of employment even while on break, but it does not establish than an accident arose out of employment." But this argument is contradicted by the Board's ruling in *Williams*. There, the Board concluded that the "rule clearly recognizes that ministering to personal comfort is conduct that is typically considered an incident of employment. Activities which are an incident of employment are considered to arise 'out of' the employment." *Williams*, 2012

12

WL 1142973, at *3; see also *Gould*, 2016 WL 2811983, at *6 (citing *Williams* for the same proposition).

Returning to the case on appeal, in support of its legal conclusion that Thach's injuries arose from his employment because of the personal comfort doctrine, the ALJ cited numerous Board decisions post-*Gould* in support of its legal conclusion.

> "Since the Court of Appeals entered its decision in *Gould*, the Board has consistently applied the personal comfort doctrine to injuries that occur when an employee is conducting personal activities while on a break from work. See e.g. *Richie v. General Motors Corp.*, No. CS-00-0436-380, 2019 WL 1595640, at *3 (Kan. W.C.A.B. March 7, 2019) ('Taking a work break is part of employment, so Richie's fall had a causal connection to her required work. Because taking a break is inherent to and casually connected to Richie's job, it is not a neutral risk without any particular employment character.'); *Edmonds v. Weller's Bar & Grill*, No. 1,079,903, 2018 WL 1720638 (Kan. W.C.A.B. March 21, 2018) (finding that claimant's injuries that occurred during a smoke break were compensable under the personal comfort doctrine); *Laughlin v. Goodyear Tire & Rubber Co.*, No. 1,077,657, 2016 WL 7655590 (Kan. W.C.A.B. Dec. 14, 2016) (finding that a claimant taking a short break to walk out to the respondent's loading dock to get some fresh air fell within the personal comfort doctrine and was compensable)."

Based upon *Gould* and these Board precedents, the ALJ provided the following factual basis for its legal conclusion that the personal comfort doctrine was applicable to Thach:

> "At the time of his accident, [Thach] was taking a 15-minute break, which was built into his shift by [Farmland]. He was on the clock in [Farmland's] parking lot on [Farmland's] premises, where he was allowed to be, as evinced by the fact that [Farmland] had a designated employee smoking area in the parking lot. Multiple employees of [Farmland] testified that people were permitted to take breaks in [Farmland's] parking lot and often did, including taking smoke breaks or sitting in their cars. Multiple employees also testified that it was not uncommon for employees to go out

13

to the parking lot during their first break and move their vehicles to closer parking spots that had opened up after the prior shift's employees had left.

"Additionally, [Thach] was required to remain on [Farmland's] premises during his break. He was wearing a radio and was on call such that if someone called his radio with a problem and needed [Thach's] assistance, [Thach] was expected to stop his break and immediately return to work to deal with the problem. [Thach] could then resume his break at a later time.

"[Thach] was showing his motorcycle to a co-worker as part of his break, and then he was going to move his motorcycle to a different parking spot because he had parked in a handicapped spot when he initially arrived at work. Multiple employees testified that [Thach] would have received a ticket had he remained parked in the handicapped spot all night, and although [Farmland] may not have charged a monetary fine for such a ticket, it is not difficult to believe that [Thach] would not have wanted to receive a ticket. Additionally, although there is no evidence that [Farmland] typically towed vehicles that were parked in violation of [Farmland's] rules, there was testimony that employee parking violations could potentially lead to discipline.

"The Court further notes that it was to [Farmland's] benefit for [Thach] to move his motorcycle, since it was improperly parked in a handicapped parking spot in [Farmland's] supervisor's parking lot. The fact that [Farmland] goes to the effort to ticket employees who park in such areas during their work shifts demonstrates that it is important to [Farmland's] business that employees park in specific locations. As such, [Thach's] act of moving his motorcycle to a different parking spot was of benefit to [Farmland]. Although the Court acknowledges that [Thach] should not have parked in the handicapped parking spot to begin with, there was considerable testimony presented that cars often improperly parked in the motorcycle parking lot, leaving no spots available for motorcycles, which would explain why [Thach] was unable to park in the motorcycle parking lot and parked in the handicapped spot instead. [Thach] demonstrated an effort to move his motorcycle to a proper parking spot at the first opportunity.

"The Court finds that [Thach's] short break and his activities during it, including moving his motorcycle to a different parking spot, fall within the personal comfort doctrine and were incidents of his employment. As such, the Court finds that [Thach] has met his burden to prove that his accidental injury arose out of and in the course of his employment with [Farmland]."

14

We are persuaded the ALJ did not err in applying the personal comfort doctrine under the factual scenario presented by this case. At the time of his accident, Thach was on an authorized and paid 15-minute break provided by Farmland. He was on Farmland's premises where he was allowed to be while on his break. Although Thach was not engaged in mechanical work when injured, Farmland retained control over Thach during his break, and Thach's responsibilities to Farmland continued throughout this brief interval.

Importantly, Farmland required Thach to remain "on call" while on his break, and to promptly interrupt this respite and return to the plant when the employer deemed it necessary to perform mechanical work. To facilitate this on call protocol, Thach was required to wear a company radio during the break. Given these facts, it is apparent that Farmland derived a company benefit from Thach being on call during this 15-minute period, and Thach, while on an authorized paid break, still owed Farmland the duty to interrupt his respite and return to the plant whenever requested by the employer. Thus, Thach's injuries arose out of and in the course of employment. See K.S.A. 2020 Supp. 44-508(f)(2).

Alternatively, Farmland argues that Thach's accident should not fall under the personal comfort doctrine because Thach "riding his motorcycle does not constitute an activity of ministering to his personal comfort." To support its assertion, Farmland cites to *Fratzel v. Price Chopper*, No. 1,066,540, 2014 WL 517247 (Kan. Work. Comp. App. Bd. January 27, 2014). There, the Board, after defining the personal comfort doctrine, stated:

> "Seeking necessary relief from discomfort (seeking warmth, coolness, or toilet facilities) is 'so obviously in the category of necessities that no question arises about their being basically in the course of employment. The only issue on which compensation is

15

sometimes denied is that of seeking these facilities in an unreasonable manner.'" 2014 WL 517247, at *5 (quoting 1 Larson's Workers' Compensation Law § 21 [2013]).

But *Fratzel* provides little support for Farmland's argument. While the case provides some guidance as to activities that are included under the personal comfort doctrine, it is not an all-inclusive list of activities, nor does it exclude an employee moving their vehicle in an employer's parking lot during an authorized break to comply with the employer's parking policies. Moreover, in *Willoughby v. Williams Seasoning*, No. 1,070,914, 2017 WL 1825146 (Kan. Work. Comp. App. Bd. April 19, 2017), the Board ruled: "Rather than categorize certain activities as 'personal comforts,' it is perhaps better to recognize that a worker attending to personal comfort is performing an incident of work."

As determined by the ALJ, Thach went to move his motorcycle on break because it was parked in a handicapped parking space. By moving his motorcycle from the prohibited handicapped parking space during the break, Thach was doing an activity that Yost said was permitted by Farmland. Moreover, employees routinely moved their vehicles during breaks. Thach was also attempting to rectify his earlier violation of Farmland's parking policy by moving his motorcycle, and thereby alleviate any personal concern about receiving a ticket. Finally, Thach wanted to show his motorcycle to Mitchell, a fellow employee, during the break. Not unlike drinking a beverage, eating food, or conversing with a fellow employee for a brief period, Thatch's activities while on his break undoubtedly provided him some personal comfort by engaging in collegiality with a fellow employee.

*Thach's Injuries Were Not the Result of a Personal or Neutral Risk*

Next, Farmland focuses on two subsections of K.S.A. 2020 Supp. 44-508(f)(3)(A)(ii) and (iii). This statute provides in relevant part:

16

"(3)(A)The words 'arising out of and in the course of employment' as used in the workers compensation act shall not be construed to include:

. . . .

(ii) accident or injury that arose out of a neutral risk with no particular employment or personal character;

(iii) accident or injury that arose out of a risk personal to the worker . . . ."

In particular, Farmland asserts that Thach's injuries relate to both of these subsections because operating a motorcycle is a personal risk disconnected from Farmland's employment. Furthermore, Farmland argues that no defect in the parking lot caused Thach to crash his motorcycle.

While the KWCA does not define neutral or personal risk, in *Hensley v. Carl Graham Glass*, 226 Kan. 256, 258, 597 P.2d 641 (1979), our Supreme Court defined the three types of risk in workers compensation cases as: "(1) those distinctly associated with the job; (2) risks which are personal to the workman; and (3) the so-called neutral risks which have no particular employment or personal character." As our court has explained, personal risks and neutral risks with no particular employment or personal character are not compensable under the KWCA. *Gould*, 2016 WL 2811983, at *6.

But being injured because of an accident while moving one's motorcycle in the Farmland parking lot is not a risk personal to Thach. See K.S.A. 2020 Supp. 44-508(f)(3)(A)(iii). Every employee who worked at Farmland and parked in its parking lot was obligated to follow the policies established by the company and park their vehicles in designated areas. This included the directive not to park in handicapped parking spaces or risk being cited by Farmland security officers. Thach went to the parking lot to move his motorcycle so he would be compliant with Farmland's parking policies. Thus, moving his motorcycle to comply with the parking policies was a work-related risk. See *Johnson v. Stormont Vail Healthcare*, 57 Kan. App. 2d 44, 52, 445 P.3d 1183 (2019).

17

Moreover, Thach was not the only employee to move his vehicle during a break. Employees moving their vehicles during breaks were a common occurrence at the Farmland plant, and company policy allowed the activity. The risks of those vehicular movements were not unique to Thach but applicable to all Farmland employees.

In summary, Thach's injuries were not the result of a neutral risk with no particular employment or personal character, nor did his injuries arise out of a risk personal to him. Like numerous Farmland plant employees while on their breaks, Thach was moving his vehicle to another parking space in compliance with Farmland parking policies at the time of his accident.

*Causal Connection Between Thach's Work Conditions and Injuries*

Farmland also asserts the Board erroneously interpreted or applied the law because there was no causal connection between the conditions under which Thach's work was required to be performed and his resulting accident, as required by K.S.A. 2020 Supp. 44-508(f)(2)(B)(i).

The Board specifically addressed the causal connection between Thach's employment and his accident:

> "From all the circumstances presented it is concluded [Thach] more than likely would not have been moving his motorcycle on his break, but for [Farmland's] parking policies. [Thach's] accidental injury was prompted by his attempt to comply with [Farmland's] parking policies, and therefore is connected to [Thach's] employment with [Farmland]."

The Board correctly concluded that Thach's injuries had a causal connection to his work conditions. As detailed earlier in the ALJ's extensive factual findings, and as previously discussed in this opinion, Thach went to the parking lot to move his motorcycle to comply with Farmland's parking policies. During this break, he was

18

required to be in radio contact with his employer in the event his mechanical work was needed in the plant. By designating certain areas of the parking lot for specific employees, Farmland demonstrated a desire to have specific groups of employees parking in designated areas and spaces. To ensure compliance with these policies, Farmland employed security guards to patrol the parking lot and ticket those parked in unauthorized locations. In short, there was a causal connection between Thach's work and his injuries.

We hold the Board did not erroneously interpret or apply the law when it concluded that Thach's accident arose out of and in the course of his employment. See K.S.A. 2020 Supp. 44-508(f)(2).

DID SUBSTANTIAL COMPETENT EVIDENCE SUPPORT THE BOARD'S FINDINGS?

For its second issue on appeal, Farmland argues that no substantial evidence supports the Board's findings.

Appellate courts review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial evidence. See K.S.A. 77-621(c)(7). "Substantial evidence" refers to "'evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis [of fact] from which the issue raised could be easily resolved.' [Citation omitted.]" *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015).

When determining fact questions, an appellate court's responsibility is to review the record as a whole to determine whether the Board's factual determinations are supported by substantial evidence:

19

"This analysis requires the court to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. The court does not reweigh the evidence or engage in de novo review. [Citations omitted.]" *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

See also K.S.A. 77-621(d).

Farmland focuses its argument on the Board's finding that Thach moved his motorcycle to comply with Farmland's parking policy. According to Farmland, the only evidence that supports this finding is speculative. It asserts that no one directed Thach to move his motorcycle the night of the accident, and that, in general, employee vehicles were not towed because of parking in non-designated parking spaces.

Farmland's parking policy provided in relevant part:

"Employees are expected to follow all parking restrictions and speed limits while on Company property. Employees without the appropriate authorization or permit may not park in restricted or reserved slots. Any vehicle parked in violation of Company rules is subject to towing at the owner's expense."

Substantial evidence supports the Board's conclusion that Thach was moving his motorcycle to comply with Farmland's parking policy. When Thach first spoke with Truong, he told him that he needed to move his motorcycle during his break. When Truong asked why, Thach told him he had parked in a handicapped parking space in the supervisor's area because all the motorcycle parking spaces were taken when he arrived for work.

Farmland's argument that no one told Thach to move his motorcycle does not alter this conclusion. The parking policy specifically stated that employees were expected to

20

park in the properly designated areas of the parking lot. Diaz-Fina and Schellhorn agreed that if an employee violated the parking policy, they would expect the employee to take corrective action to rectify the violation. When asked whether parking in a handicapped space without a permit was against Farmland policy, Diaz-Fina replied that "[i]t is a violation of company and government rules."

Similarly, Farmland's argument that the parking lot policies were not strictly enforced is unpersuasive. Part of Seeney's responsibilities included performing parking lot checks to ensure employees parked in designated areas of the parking lot. When he observed a car that was parked in the supervisors' area that did not have a sticker, Seeney issued a ticket for the violation.

Upon our independent review of the ALJ's extensive and detailed factual findings, as adopted by the Board, and in light of the record as a whole, we conclude the findings are supported by substantial competent evidence.

Affirmed.